WILLIAM E. KELLEY *vs.* CITY COUNCIL OF THE CITY OF CRANSTON.

AUGUST 5, 1938.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon JJ.

CAPOTOSTO, J. This is a petition for a writ of *certiorari* to review and quash the record of the hearing of certain charges against the petitioner before the city council of the city of Cranston, and also to review and quash the record of the decision of that body, dated April 15, 1938, finding the petitioner guilty of the charges perferred against him and ordering his removal by the mayor as a member of the permanent police department of the city of Cranston.

Upon the filing of the petition in this court, a citation was issued to the respondent returnable May 23, 1938, to show cause why the writ of *certiorari,* as prayed for, should not be issued. On May 23, the return-day thereof, the petitioner appeared through his counsel, as did the respondent, the latter bringing before us the certified record and papers pertinent to the case. In the circumstances both petitioner and respondent requested the court that the matter be treated as if such record and papers were returned on a writ of *certiorari* which had been duly issued and served. This request being granted, the case proceeded to hearing as if the writ of *certiorari* had issued.

It appears by the petition that, on February 15, 1938, the mayor caused written notice to be served upon the petitioner, informing him that he, the mayor, had sus-

pended the petitioner as a member of the permanent police force of the city of Cranston, upon charges made against him by the chief of police of that city and filed with the mayor. The charges specified in this communication were as follows: "You are charged with misconduct as a Police Officer in that, on Sunday February 13, 1938, you failed to pull your duty call at 4:40 A.M. as required by police regulations, and were thereafter found asleep in the building of the Amoco Gas Station, so called, at the corner of Pontiac Avenue and Park Avenue in said City of Cranston." This communication further advised the petitioner that such charges would be submitted to the city council on Friday, February 18, 1938, at 8 p.m., at which time the petitioner would be given an opportunity to be heard thereon.

The petition further alleges that the petitioner appeared on February 18, 1938, according to the written notice served upon him, and challenged the jurisdiction of the city council to try and determine the charges against him at its meeting of that date; that notwithstanding such protest, the city council proceeded to hear the testimony of witnesses in support of the charges, and, upon the termination of that hearing, the city council, which was composed of eighteen councilmen with the mayor as presiding officer, unanimously adopted a resolution declaring him guilty of misconduct and ordering his removal and dismissal as a member of the police department; that thereafter these proceedings before the city council were reviewed here on *certiorari,* and that this court then found that the city council was without jurisdiction to try the petitioner at its meeting of February 18, 1938, and ordered the record to be quashed. This allegation in the petition refers to our recent decision in *Kelley* v. *City Council of City of Cranston,* 60 R. I. 299, 198 A. 346, where the extent of the relief granted and the reasons therefor are fully stated.

The petitioner further alleges that on April 9, 1938, written notice was served upon the petitioner that the above-mentioned charges pending against him would be heard by the city council at its meeting on April 15, 1938, at 8 p.m.; that he appeared with counsel at that meeting, and that, as soon as the charges against him were called for hearing, he filed two challenges and protests in writing, which are set out in the petition, one directed to the mayor and the other to the members of the city council, severally and collectively, challenging their right and the right of each of them to hear and determine the charges against him by reason of disqualification.

The ground of disqualification stated by the petitioner in his written challenge and protest to the mayor is that the mayor, who presided at the meeting of the city council of February 18, 1938, "by his approval of the vote of said City Council that said respondent (the petitioner herein) was guilty of misconduct under the charges here pending showed prejudice against respondent and is not a fair and impartial presiding officer, or in the event of a tie vote, a voting member of said City Council and is not now a fair and impartial trier of the facts." The ground of disqualification stated by the petitioner in his challenge and protest to the city council and each member thereof is that, having participated in the hearing of the charges against the petitioner on February 18, 1938, and having voted that he was guilty of the same charges upon which he was again about to be tried, they had prejudged the petitioner on those charges and, therefore, were not then "fair and impartial triers of the facts."

The petition further alleges that, notwithstanding the petitioner's challenges and protests, the mayor and city council proceeded to hear and determine the charges against the petitioner by receiving testimony in support and in defense of the charges, and that, at the conclusion of the hearing, the city council unanimously voted that the peti-

tioner was guilty of misconduct, as charged, and ordered his dismissal as a member of the police department of the city of Cranston. The petitioner contends that this action of the mayor and city council was without warrant in law and that he was illegally removed from office.

The facts recited in the petition are substantially supported by the evidence in the instant case, with the exception of the allegation in reference to our decision in the *Kelley* case, *supra,* which is too broad. We held in that case that, according to the provisions of public laws 1923, chapter 472, under which the charges against this petitioner were preferred, the city council was without jurisdiction to proceed with the hearing of those charges at the meeting of February 18, 1938, and that, under the statute, the hearing should have been continued to the next regular meeting of the city council. But we also held that the charges against the petitioner had been properly preferred and that he had received sufficient notice of the pendency of those charges. In quashing "such parts of the record of the meeting of the city council of Cranston on February 18, 1938, as set forth the hearing of charges against William E. Kelley, and the vote ordering his removal from office as a member of the permanent police department of said city", we expressed the opinion that it was in the interest of all concerned, including the public, that the charges, of which the petitioner had sufficient notice and which were unaffected by our order, should be promptly heard and determined. We therefore held that, in view of the special circumstances in the case, "the charges already made in writing to the city council may properly be heard and determined at its next regular meeting" after the filing of our opinion.

The transcript of the proceedings before the city council in the instant case shows that, immediately after the reading of the petitioner's challenges and protests above mentioned and the filing thereof with the city council,

the following conversation took place between the city solicitor and counsel for the petitioner: Mr. Day: "At this time, Mr. Sullivan, do you or Mr. Kelley desire to present evidence in support of your charge that Mayor Ernest L. Sprague and each and every one of the councilmen whom you have named are biased and prejudiced and incapable of rendering a fair and impartial verdict on the evidence?" Mr. Sullivan: "I stand on the record," Mr. Day "I take it you don't care to present any evidence. Am I correct?" Mr. Sullivan: "I stand on the record."

The transcript further shows that the city solicitor then addressed the mayor as follows: "For the record, Mr. Mayor, is there any reason why you cannot sit here tonight and, if called upon to vote under the charter of this city, render an absolutely fair and impartial verdict on such evidence and testimony as will be presented here tonight?" Mayor Sprague: "There is no reason whatsoever." He then addressed a similar question to the members of the city council, admonishing them that it was their duty and the duty of each one of them to make it known if they could not give the petitioner a fair hearing, so that any such might be . excused from serving at that time. Receiving no answer to his question and admonishment, the city solicitor had it noted on the record that "no one of the councilmen in response to my several and collective questions, has stated that he is unable to render an absolutely fair and impartial verdict in this matter." The petitioner, even under these circumstances, did not see fit to present evidence as to the existence of any bias or prejudice on the part of the mayor or the city council against him personally, nor did he make or request that he be permitted to make any inquiry in reference thereto, but elected to go to hearing on the merits of the charges, cross-examining the witnesses against him and testifying in his own defense.

It appears in evidence that, on February 12, 1938, the petitioner went on duty at 11:45 p.m., and that according to the police regulations he was required to send hourly calls from police boxes on his post to police headquarters, commencing at 12:40 a.m. of February 13, 1938. When a call did not come in from him at 4:40 a.m., the desk officer at police headquarters notified Lieutenant Bourret, who was in charge, whereupon the lieutenant ordered Sergeant Arthur C. Wilson to look for the petitioner. Sergeant Wilson testified that, in carrying out this order, he traveled in his car over the various streets in the district patrolled by the petitioner, without finding him, and that finally, at 5:35 a.m. he located him in the building of the Amoco Gas Station, at the corner of Pontiac avenue and Park avenue ·in the city of Cranston; that the petitioner was then asleep with his hat and coat off; that the door of the gas station was locked; that he first rattled the door and, failing to "wake him up", he rattled the loose glass in a side window, when the petitioner "woke up" and unlocked the ·door; that there was a radio in the station, which was going at that time, and that when he told the petitioner that the latter had missed his call, the petitioner said that "he fell asleep."

Sergeant Wilson further testified that he took the petitioner to a police box about one half mile from the gasoline station and had him call headquarters from that box; that the witness also talked with headquarters, and that, before leaving the petitioner to attend to some other police business, he ordered him "to make out a report on missing the box". He further testified that when he saw the petitioner at headquarters, at about 7:45 that morning, he asked him if he had made out a report, and that the petitioner replied that he had not, but that he would make one out. The transcript shows that no report was ever made by the petitioner.

Sergeant George H. Dibble testified that on February 13, 1938, acting upon orders from the chief of police, he notified the petitioner at his home that he was excused from roll call until further notice, and that at that time the petitioner told him that "he fell asleep in this Gas Station and was there probably a couple of hours." Cross-examination of this witness was waived by the petitioner.

James G. Miller, the chief of police of the city of Cranston, testified that when it was reported to him that the petitioner had missed the call above mentioned, he first consulted the time sheet and tape, and, finding no such call from the petitioner registered thereon, he excused him, on February 13, 1938, from roll call until further notice. His testimony further shows that when the petitioner failed to make a written report as to why he had missed his box call, the chief, acting in accordance with the rules and regulations of the Cranston police department, a copy of which the petitioner had, sent a written communication to the mayor, dated February 14, 1938, charging the petitioner with "misconduct as a police officer", and as grounds therefor specified the charges which are involved in the instant case.

It appears of record that, following the receipt of this communication, the mayor, in his letter of February 15, 1938 to the petitioner, suspended the petitioner as a member of the police department and, specifying therein the charges as preferred by the chief of police and above set forth by us, notified the petitioner that such charges would "be submitted to the City Council on February 18, 1938", on which date those charges were in fact presented to the city council. The legality of the hearing at that time of the charges so preferred and transmitted by the mayor to the city council was the subject of our decision in *Kelley* v. *City Council of City of Cranston, supra.*

The petitioner in his testimony in the instant case does not deny or contradict the controlling facts as above set

forth. His defense, in substance, was that during the early hours of February 13, 1938, he had taken various doses of syrup of codeine for a cold; that he went into the gasoline station to use the toilet facilities; that thereafter, feeling weak and nauseated, he sat in a chair; that he must have fallen asleep and was aroused by a rattling of the door and a knocking on the window; and that the next thing he knew "Sergeant Wilson came in." He attributed his falling asleep to his physical condition and to the heat and lack of ventilation in the gasoline station.

In cross-examination the petitioner admitted that he had not reported sick at headquarters, and that he did not tell Sergeant Wilson or Sergeant Dibble, with both of whom he was on friendly terms, that he had been suddenly taken ill, or that he had gone into the station for personal reasons, or that he had been "taking codeine" for his cold. He denied that the radio in the gasoline station was going or that he told Sergeant Wilson that he fell asleep in the gasoline station, as he could not say whether or not he was asleep. He further testified that he could not remember what he said to Sergeant Dibble, in reference to being asleep in the gasoline station, when that officer came to his home to notify him that he was excused from roll call, and he explained his failure to file a written report by saying that on another occasion, some three or four years previous, he had fallen asleep in the Highway Garage in Arlington, and that at that time an oral explanation to the chief was deemed sufficient.

The petitioner concedes that in the instant case there was competent testimony in the record to support the finding of the city council, but contends that both the city council and the mayor were disqualified as a matter of law on the ground of bias and prejudice for the reasons assigned in his challenges and protests above described. He argues that in hearing the charges against him, the mayor and members of the city council were acting in

two distinct capacities: as jurors deciding the facts, and as judges of the law; that, in order to be qualified to act, they should have satisfied the qualifications required by general laws and our statutes, relating to both jurors and judges; and that they were disqualified to act in either capacity as they had already expressed an opinion on the merits of the very question in controversy.

It is true that to a certain extent the hearing of charges against a police officer by a city council partakes of the nature of a trial, and it is beyond question that the accused officer is entitled to a fair and impartial hearing. The city council, when sitting as the triers of the charges, as it did in the instant case, was acting as a quasi-judicial body, and, therefore, was bound by the fundamental principles that are binding on all judicial bodies. *Hanna* v. *Board of Aldermen,* 54 R. I. 392, 396. But the city council, in the performance of such disciplinary duties, is not a court. It always retains its primary character of a legislative and administrative tribunal, and its action must be examined in view of the purposes for which it is created and organized.

We have already said that the petitioner was entitled as of right to a fair and impartial hearing, and we agree with him that, if the city council or the mayor entertained bias or prejudice against him, within the legal meaning of those terms, he did not have such a hearing. Whether the city council and the mayor were in fact biased and prejudiced, when they heard the charges that had been preferred against the petitioner by the chief of police, is a matter which can be determined on review by this court, in the light of all the facts and circumstances appearing in the record.

The existence of bias and prejudice within the legal meaning of those terms must be shown as a matter of fact by the person claiming a disqualification on those grounds, and not merely presented as a matter of the

opinion of that person. In the absence of statutory provision, it is generally recognized that in order to disqualify a judge on the ground of his bias or prejudice, which is not on the basis of interest, the party urging disqualification . must affirmatively establish that the judge has personal bias or prejudice against him by reason of preconceived or settled opinion, of a character calculated to seriously impair his impartiality and sway his judgment. 33 C. J. § 151, page 1000 *et seq*. On the other hand, a juror, even in a criminal case, is not disqualified merely because he may entertain an opinion on the matter in dispute, unless his opinion is so fixed and settled as to require evidence to remove that opinion before he could consider the legal evidence in the case impartially and give to such evidence its proper weight and effect. *State* v. *Jacques,* 30 R. I. 578.

Were we to apply the contentions of the petitioner, there is no evidence to show that the mayor and the city council, collectively or as individuals, were disqualified by reason of bias and prejudice to hear the charges against him on April 15, 1938. The petitioner had full opportunity to show that the mayor and the members of the city council had personal bias or prejudice against him, or had a fixed opinion of his guilt or innocence. Instead of doing so, he elected to "stand on the record", which meant that he was satisfied to rest his claim of bias and prejudice entirely on the grounds expressed in his challenges and protests to the city council, as above set forth.

Opposed to this action by the petitioner, we find the city solicitor inquiring of the mayor and members of the city council whether they, or any of them, were biased or prejudiced against the petitioner, admonishing them that, if such were the fact, it was their duty to make it known. At the instance of the city solicitor it was noted on the record that in response to his questions and admonishment no one stated that he was unable to render an "absolutely fair and impartial verdict" in the matter. In the absence of evidence to

the contrary, it is fair to assume that these sworn public officials were, in fact, without bias or prejudice towards the petitioner.

In support of his contention, the petitioner strongly urges that the decision in *Hanna* v. *Board of Aldermen, supra,* is decisive of this point in the instant case. We do not agree with him. The controlling facts in the *Hanna* case are fundamentally different from the facts now before us. Without going into unnecessary details, for the opinion in that case speaks for itself, we point out that there three of the six members of the board of aldermen, acting as the committee on police of the board of aldermen, actively conducted a personal investigation concerning certain conduct of the chief of police; that they preferred the charges against him; and that, without even hearing the chief, they adjudged him guilty of dereliction of duty "through gross incapacity or willful neglect", and recommended his removal from office. When these charges, so made, came up for hearing by the board of aldermen, the chief protested to the board, claiming that the three members of the committee on police should not sit as members of the board to hear and decide said charges. This protest was overruled and these three members sat and took part in the trial and decision of the board. At the conclusion of the hearing they, with two other members of the board, found the chief guilty.

In the instant case the charges against the petitioner were investigated by the chief of police and preferred by him to the mayor, who, in accordance with law, transmitted them to the city council for hearing and determination. There is no evidence that the mayor, or city council, or any individual member thereof took any part in investigating or prosecuting these charges. There was clearly no prejudging of the petitioner by the mayor or by any member of the city council, prior to the initial decision of the city council on February 18, 1938.

The petitioner also refers us to our recent decision in *Narragansett Racing Association* v. *Kiernan,* 59 R. I. 90, 194 A. 692. That case is no authority in the instant case. There the chairman of the racing commission, in spite of a claim of bias and prejudice of a personal nature on his part against the association, which the association was ready to support with evidence but was denied that right, sat in judgment at the hearing and took active part in the decision of the commission against the association. This situation, together with other circumstances which appear in our opinion, in justice required the quashing of the record in that case. The facts in the instant case are clearly different.

The petitioner contends that because the mayor and city council participated in the hearing of February 18, 1938, and found him guilty, as charged, on the evidence then before them, they were thereby disqualified as a matter of law, by reason of bias and prejudice, from sitting and hearing those same charges on April 15, 1938, which is the hearing now in question. As we have already stated, the existence of bias or prejudice is a question of fact to be determined from all the facts and circumstances in each case. Finding the petitioner guilty on February 18, the record of which decision was quashed for reasons above stated, is a material circumstance to be taken into consideration in determining whether the mayor and city council were in fact biased and prejudiced against the petitioner; but such circumstance alone is not conclusive evidence of bias or prejudice as a matter of law. The decision of the city council on February 18, in which the petitioner chose to present no evidence in his behalf, does not necessarily and conclusively show that at the hearing of April 15, where the petitioner was fully heard in his own defense, the city council was unable to give the petitioner a fair and impartial hearing after ample notice of that hearing.

Whether the mayor or the city council was in fact biased and prejudiced against the petitioner on April 15 depends

upon a fair consideration of the facts and surrounding circumstances in the case, including the prior decision of February 18. It is clear from the record before us that, notwithstanding the action of the city council on February 18, neither the mayor nor the members of the city council, severally or collectively, entertained any bias or prejudice against the petitioner on April 15. We are, therefore, of the opinion that on April 15, when the charges were fully heard on the merits, with the petitioner cross-examining the witnesses against him and testifying in his own defense, the petitioner was given a hearing according to law. As this court said in *Keenan* v. *Goodwin,* 17 R. I. 649, at page 650: "An irregular proceeding does not incapacitate a legally constituted tribunal from subsequently proceeding in a regular and proper manner." See *Appeal of John H. Willard,* 4 R. I. 595; *Appeal of John H. Willard,* 4 R. I. 597; *People ex. rel. Aeberly* v. *City of Chicago,* 240 Ill. App. 208.

Upon a careful consideration of the record, together with all the facts and circumstances in evidence, we are of the opinion that neither the mayor nor any member of the city council was disqualified as a matter of law from participating in the hearing of April 15, 1938; that neither the mayor nor any member of the city council had any bias or prejudice against the petitioner at the time of that hearing; and that there is sufficient competent and legal evidence to support the conclusion of the city council that the petitioner was guilty of the charges preferred against him by the chief of police and the action ordering his removal as a member of the permanent police department of the city of Cranston.

For the reasons stated, the writ of *certiorari* is quashed, and the papers are ordered remitted to the respondent.

*Edward W. Day,* for complainant.

*Edward M. Sullivan,* for respondent.